In re Wilbur L. **CORNNER,** Debtor.

Joseph M. **DORIAN,** Plaintiff,

v.

Wilbur L. **CORNNER,** Defendant.

Bankruptcy No. 94–00111–BGC–7.
Adv. No. 94–00111.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Aug. 18, 1995.

Haran Lowe, Jr., Birmingham, Alabama, for plaintiff.

Rodger Smitherman, Birmingham, Alabama, for defendant-debtor.

James G. Henderson, Trustee.

## MEMORANDUM OPINION

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for trial on the *Complaint to Determine Dischargeability of Debt* filed by Mr. Joseph M. Dorian. Mr. Joseph M. Dorian, the plaintiff; Mr. Wilbur L. Cornner, the defendant; Mr. J. Haran Lowe, Jr. and Mr. David L. Rawls, attorneys for the plaintiff; and Mr. Rodger M. Smitherman, attorney for the defendant, appeared. The matter was submitted on the testimony offered, the exhibits admitted into evidence, the record in the case and the arguments of counsel.

## I. FINDINGS OF FACT

Mr. Dorian ("Dorian") owned an automobile dealership named Hoover Imports. In 1991 he sought extra operating capital which he believed could improve the profitability of Hoover Imports by making it more flexible. Dorian testified that although Hoover Imports was not having financial problems, he needed from $200,000 to $300,000 to operate at the level of profitability he desired. At that time, Dorian had lines of credit at Central Bank and SouthTrust Bank and his credit history and rating were excellent, but he could not convince either SouthTrust or Central to increase his credit lines.

Five or six months after Dorian began his search, in July or August 1991, Mr. Cornner ("Cornner") came to visit him at Hoover Imports. Cornner was an acquaintance of Dorian's. They had become acquainted many years before when both were car salesmen for separate automobile dealerships. Cornner represented to Dorian that he was the executive vice president of Cornner Armstrong Phinancial Services, Inc. ("CAPS") and was in the business of finding loans for persons who were unable to find loans through conventional means. This first meeting was apparently coincidental and not planned.[1]

Several days later Cornner returned to Dorian's place of business. On that occasion, he and Dorian discussed a transaction where Cornner would, in return for a fee, procure a business loan for Dorian. According to Dorian's testimony, Cornner told Dorian that Cornner could obtain a $1,000,000 line of credit for Dorian that would be unsecured by any of Dorian's then existing assets. According to Cornner's testimony, Dorian told Cornner that he wanted to explore the possibility of obtaining a loan for his business and asked Cornner if he thought that he could help him, and Cornner told Dorian that he believed that he knew some sources from which he could arrange a loan for Dorian. After that, Dorian met with Cornner five or

---

1. Cornner testified that based upon representations made to him by the "Armstrong" of Cornner *Armstrong* Phinancial Services, Inc., he believed at the time of his dealings with Dorian that CAPS was a corporation and that he owned half of the stock in the corporation, although he admitted that he never signed any documents relating to the incorporation. Plaintiff's Exhibit 3 is a document from the Alabama Secretary of State certifying that there is no record of any corporation by that name.

six times at Hoover Imports, and had numerous telephone conversations with Cornner. According to Cornner, during one of those conversations, Cornner informed Dorian that "it would require a lot of phone calls and stuff like that to get it done and there would be a retainer charge to do it." Dorian called several references given to him by Cornner.

On August 6, 1991, Cornner gave a commitment letter to Dorian. Pla.Ex. 2. The commitment letter specified that in the event Dorian gave CAPS a "retainer" by August 7 at 2:00 p.m., Cornner "personally guaranteed" that he would refund the retainer in full, if he had not procured a loan for Mr. Dorian within 20 days after receipt of the retainer. Dorian testified that Cornner gave him the commitment letter so that Dorian would give him the $5,000. Cornner testified that he gave Dorian the letter to let Dorian know that he was "not trying to hook or crook anyone."

Initially, Cornner asked for a retainer of $10,000 but Dorian was only willing to give him $5,000.[2] Dorian gave the initial $5,000 retainer to Cornner shortly after August 7, 1991. Cornner then ostensibly began to find a loan for Dorian. Cornner testified that he spoke to several companies in an effort to obtain a line of credit for Dorian, and that on 15 to 20 occasions he worked on Dorian's loan application by meeting with Dorian or making long distance phone calls to prospective lenders.

Dorian never received any money from CAPS or Cornner in the form of a loan or otherwise, nor did he receive a loan as a result of any efforts on the part of Cornner or CAPS. Dorian asked Cornner to return his $5,000.00 but Cornner would not. After the time limit specified in the commitment passed, and Dorian had not received a loan or his retainer back, Dorian met with Cornner five to eight times at Hoover Imports and had 30 to 50 phone conversations with Cornner, in an attempt to find out why the promised loan had not been made and why his retainer had not been returned. Dorian

even visited Cornner's house on two or three occasions. During this time, Cornner continuously reassured Dorian that he was still trying to fund a loan, however, Dorian contends that Cornner never intended to provide him a loan within 20 days of his receipt of the retainer, and never intended to refund the retainer if the loan was not made within 20 days.

In December 1991, a meeting took place at Dorian's place of business. According to Dorian, he did not request the meeting. Present at the meeting were Mr. Claude Noel, Mr. Isaacs Armstrong, Cornner and Dorian. Noel was introduced to Dorian as a representative of a company named Group Marchant. Before the meeting, Dorian had not spoken with anyone from Group Marchant, and did not know anything about the organization. Cornner testified that he did not work for Noel, but that he and Armstrong were referring Dorian's loan through Noel's company.

Armstrong and Noel came to the meeting first and were there for 30 to 40 minutes before Cornner arrived. Before Cornner arrived, Dorian, Noel, and Armstrong had a conversation in which Noel or Armstrong apparently outlined a proposition whereby Group Marchant would arrange an "offshore loan" for Hoover Imports. As part of the deal, Dorian would first have to wire transfer $25,000 to a representative of Group Marchant in Chicago. As part of the transaction, Noel brought a document with him entitled "International Certificate of Deposit." Pla. Ex. 4. The certificate has a maturity date of June 1, 1992. The depositor shown on the certificate is a Mr. Leon Gabriel. Dorian testified that he did not know Gabriel, but that printed on the back of the certificate is language which purports to be an endorsement of the certificate by Gabriel to the bearer of the instrument. The certificate was discussed among Dorian, Armstrong and Noel before Cornner arrived.

When Cornner arrived, Noel gave the certificate to Cornner. Cornner, in turn, gave the document to Dorian. Dorian did not

---

**2.** Dorian testified that he gave Cornner $5,000. On direct examination Cornner testified that Dorian paid him $5,000. On cross examination, Cornner stated that Dorian gave him between $2,500 and $5,000, but admitted that in a deposition previously given by him in this case he had testified that he had received $5,000 from Dorian.

testify that *Cornner* made a representation to him *at that time* regarding the reason he was being given the "certificate." According to Dorian, Cornner later told him that the certificate was a legitimate document and that it could be cashed on the maturity date and that it was further security for the retainer. Dorian testified that the reason he was given the certificate was as security for the additional $25,000 he was to wire to Chicago. It was a "peace of mind security" given to Dorian so that he would send the money to Chicago.

On the occasion of the meeting between Dorian and Noel, Armstrong and Cornner, according to Cornner's testimony, Cornner actually believed that funding was in place for Dorian to receive his loan. Cornner also testified that he did not know where Noel obtained the certificate of deposit, but that the certificate of deposit was collateral for the $25,000 to be wired by Dorian "to set up the account for Hoover Imports." On cross examination, Cornner admitted that, in an earlier deposition, he stated that the $25,000 was "considered a retainer to get stuff done." Pla.Ex. 1, page 33. Cornner emphasized, however, that the retainer, was for Noel. Cornner acknowledged that he told Dorian that the certificate of deposit was, to the best of his knowledge, "good," but admitted that he never attempted to verify the authenticity of the certificate of deposit. He stated that he did not attempt to verify the authenticity of the certificate *before* the meeting because he had not seen the document and because the document had already been presented to Dorian when he arrived at the meeting. He stated that he did not attempt to verify the authenticity of the certificate *following* the meeting because he did not have possession of the document.

Dorian did not immediately wire the money. Sometime between three and seven days following the meeting, Cornner contacted Dorian and came to Dorian's office. He told Dorian that the loan was in place and that he needed to wire the money to Chicago. Cornner told Dorian that the money needed to be wired to a person named Gene Menard in Chicago and gave Dorian the account number and "wiring coordinates" to accomplish

that task. He told Dorian that the $25,000 was a retainer.

Cornner testified that Dorian was supposed to have given the $25,000 to him to wire, rather than making the wire transfer personally; but that Dorian told him that he wanted to handle the wire transfer and asked Cornner for the wiring coordinates. According to Dorian, Cornner accompanied him to a local bank. According to Cornner, Dorian wired the funds and then came to Cornner's house with a receipt showing that the money had been wired. Both agree that while at the local bank, Dorian personally wire transferred $25,000 to the bank account in Chicago specified by Cornner.

Dorian made no independent investigation regarding Noel or Group Marchant. He did not, independently of the representations made to him at the meeting, verify that Group Marchant actually existed, or that Group Marchant actually conducted any business at all, or that Noel was actually connected with Group Marchant, or that Gene Menard was actually connected with Group Marchant. Dorian did call to verify that there was an actual "First Canadian Bank," the bank named on the certificate of deposit.

According to Cornner, neither he nor Armstrong had any control over the loan that Group Marchant was supposed to have arranged for Dorian or over Dorian's money after it was wired. Group Marchant provided no loan to Dorian and Dorian received no loan as a result of the efforts of any representative of Group Marchant, nor did he receive any of his money back from Group Marchant. After June, 1992, Dorian attempted to cash the certificate but was informed by SouthTrust Bank and a bank in Switzerland that the certificate was worthless.

When Dorian was asked why he sent the money to Chicago when Cornner had already failed in his initial promise to obtain a loan for Dorian within 20 days of payment of the initial $5,000 retainer, Dorian said that he sent the money because, according to Cornner, that was what was needed to be done, and that the transfer was simply an additional requirement of setting up an "offshore loan." Dorian testified that he relied on the

certificate when he transferred the money and contends that Cornner committed fraud when he represented that the certificate of deposit was valid, authentic and could be cashed on its maturity date. Cornner testified that he did not know that Dorian was being defrauded by Noel or that the certificate of deposit was not authentic. According to Cornner, neither he nor Armstrong received any portion of the $25,000. Dorian offered no proof that Cornner received any of the $25,000 wired to Group Marchant.

3. A litigant in a bankruptcy dischargeability proceeding will be collaterally estopped from relitigating issues previously decided in a related state court proceeding. *In re St. Laurent,* 991 F.2d 672, 675 (11th Cir.1993). Collateral estoppel only applies to prevent the retrial of issues actually litigated in the previous proceeding. In determining the estoppel effect of a state court judgment, the bankruptcy court must apply state law. *Id.* In Alabama, it is doubtful that a default judgment has any collateral estoppel effect. *See Smith v. Union Bank & Trust Co.,* 653 So.2d 933 (Ala.1995) (dismissal without prejudice of plaintiff's lawsuit for failure to amend complaint would not be given collateral estoppel effect in subsequent action brought by plaintiff against same defendant); *AAA Equipment & Rental, Inc.,* 384 So.2d 107 (Ala.1980) (stipulated judgment entered against codefendants did not operate as estoppel upon subsequent action by one of codefendants against other codefendants). *See also In re Booth,* 174 B.R. 619, 623 (Bankr.N.D.Ala. 1994) ("The law in Alabama ... is that neither a *consent* judgment nor a *default* judgment can satisfy the 'actually litigated' element.") *Id.* (emphasis in original) (citations omitted).

In any event, Dorian failed to offer into evidence the complaint filed by him in state court, or the actual judgment rendered by the state court, or any other portion of the record in the state court case from which this Court might determine the factual basis of the state court judgment. Dorian furthermore failed to prove by extrinsic evidence that any of the issues in the state court case are identical to those in the present adversary proceeding. Collateral estoppel effect may not, therefore, be accorded the default judgment obtained by Dorian against Cornner in the state court. *See Balbirer v. Austin,* 790 F.2d 1524, 1527–1528 (11th Cir.1986) (consent judgment entered in state court would not constitute collateral estoppel in bankruptcy dischargeability action where party pleading estoppel did not prove from record of the prior case or through extrinsic evidence that the parties intended the consent judgment to operate as final adjudication of particular issues). *See also In re Poston,* 735 F.2d 866 (5th Cir.1984) (bankruptcy court did not err in failing to accord collateral estoppel effect to state court default judgment in dischargeability action where copy

■ Dorian filed a state court lawsuit against Cornner which resulted in a default judgment against Cornner for $70,000.00. Cornner testified that he instructed his attorney to file a motion to set aside the default judgment. Cornner appeared at a hearing on that motion. According to Cornner, a settlement was reached at the hearing whereby Dorian agreed to reduce the amount of the judgment from $70,000 to $35,000 and in return Cornner agreed not to pursue his motion to set aside the default judgment.[3]

of default judgment admitted into evidence contained insufficient facts to support conclusions of state court that judgment was based on false pretense and fraud), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 700 (1984); *In re Booth,* 174 B.R. 619 (Bankr.N.D.Ala.1994) (consent judgment entered in state court litigation would not be given collateral estoppel effect in bankruptcy dischargeability action where judgment did not recite findings of facts which constituted fraud); *In re Martin,* 171 B.R. 395 (Bankr.N.D.Ala.1994) (default judgment entered in state court malicious prosecution litigation would not be given collateral estoppel effect in bankruptcy dischargeability action where judgment did not recite findings of facts which constituted willful and malicious conduct).

Ordinarily, in a dischargeability proceeding, a state court judgment is res judicata as to the validity and amount of the debt, *In re Reitz,* 69 B.R. 192, 198 (N.D.Ill.1986); *Martino v. Brown,* 34 B.R. 116, 117 (D.N.M.1983); *In re Mason,* 175 B.R. 299, 303 (Bankr.W.D.Mo.1994); *In re Neely,* 125 B.R. 392, 395 (Bankr.S.D.N.Y.1991); *In re Gibbs,* 107 B.R. 492, 496 (Bankr.D.N.J. 1989); *In re Morton,* 100 B.R. 607, 612 (Bankr. N.D.Ga.1989); *In re Hogan,* 47 B.R. 124, 126 (Bankr.W.D.Wis.1985), even though the judgment was entered by default. *In re Comer,* 723 F.2d 737, 740 (C.A.9 1984); *In re Adams,* 147 B.R. 407, 418 fn. 27 (Bankr.W.D.Mich.1992); *In re Sullivan,* 122 B.R. 720, 723 (Bankr.D.Minn. 1991); *In re Holt,* 102 B.R. 116, 119 (Bankr. S.D.Ohio 1989); *In re Brown,* 56 B.R. 954, 959 (Bankr.E.D.Mich.1986); *In re Moccio,* 41 B.R. 268, 272 (Bankr.N.J.1984). *See also Ex parte State of Alabama ex rel. V.E.T.P.,* 646 So.2d 551, 552 (Ala.1993) (default judgment has res judicata effect); *McDonald v. U.S. Die Casting & Dev. Co.,* 628 So.2d 433, 434 (Ala.1993) (default judgment has res judicata effect). In this case, however, only that portion of the judgment, if any, which is attributable to the $5,000 transaction is nondischargeable. Since the evidence presented does not indicate whether Dorian's state court lawsuit was based on the $5,000 transaction or on the $25,000 transaction, or both, or what portion of the judgment, if any, was entered based on the $5,000 transaction, the state court judgment cannot be res judicata as to either the

▇▇▇▇ Mrs. Cathy Porterfield, ("Porterfield") another of Cornner's former "clients" testified in this adversary proceeding.[4] Port-

erfield testified that she first met Cornner in late December 1992, or early January 1993.

validity of amount of the debt based on the $5,000 transaction.

4. Cornner objected to Porterfield's testimony. The Court overruled the objection and allowed the testimony, but stated that the testimony would be considered only if it satisfied specific criteria. Under the test recognized by the Court at the trial of this matter, the Court finds that the Porterfield testimony does satisfy the requisite criteria. Federal Rule of Evidence 404(b) allows the admission of evidence of other wrongs to prove intent. Such evidence of similar acts are admissible under the rule if: "1) they are relevant to an issue other than the defendant's character; 2) there is clear and convincing evidence that the defendant committed the other similar acts; and 3) any potentially unfair prejudice of the evidence does not substantially outweigh its probative value." *In re Kroh,* 88 B.R. 987, 988 (Bankr.W.D.Mo.1988) (citations omitted). The admissibility of evidence of similar acts to show intent is accepted in this circuit. See, *Jones v. Childers,* 18 F.3d 899, 913 (11th Cir.1994); *See also, Dial v. Travelers Indemnity Co.,* 780 F.2d 520, 523 (5th Cir.1986). Based on the above test, the Court finds that: 1) the Porterfield testimony does not relate to Cornner's character and is relevant to intent; 2) there is clear and convincing evidence that Cornner committed the similar acts; and 3) the unfair prejudice of the evidence against Cornner does not substantially outweigh its probative value.

The reason for allowing such evidence is clear. The perpetrator of fraud is, most often, the sole possessor of actual knowledge of such fraud. Great latitude is thus allowed in admitting evidence on the issue of alleged fraud and undue restriction should not be placed on the introduction of evidence which has probative value, however slight, on this issue. *Mid–State Homes, Inc. v. Johnson,* 294 Ala. 59, 63, 311 So.2d 312, 315 (1975). Also, since present intent not to perform a future act is difficult to prove by direct evidence of a defendant's state of mind, a plaintiff may meet this burden by circumstantial evidence. *Marshall Durbin Farms, Inc. v. Landers,* 470 So.2d 1098, 1101 (Ala.1985).

Generally speaking, evidence of similar fraudulent acts is admissible to show a fraudulent intent, plan, or scheme, provided that the acts meet the requirements of similarity in nature and proximity in time. Gamble, McElroy's Alabama Evidence § 70.03(1), pages 215–216 (4th ed. 1991). Specifically, and even more to the point in this case, evidence of other similar failures to perform may be considered to establish that a defendant never intended to perform a promise made. *Baker v. State,* 588 So.2d 945, 947 (Ala. Crim.App.1991); *Benefield v. State,* 469 So.2d 699, 701 (Ala.Crim.App.1985).

In *Baker,* Baker contracted to reroof the Terrells' house for $1,200. The money was paid up front. Baker took off the old roof and removed much of the underlying wood, claiming it would

have to be replaced, but did not place a new roof on the house as he had promised. Baker was charged criminally with violating Ala.Code § 13A–8–2, which provides that a person commits the crime of theft of property if he "[k]nowingly obtains by deception control over the property of another, with intent to deprive the owner of his property." Under that code provision, deception occurs when a defendant knowingly "[p]romises performance which the defendant does not intend to perform or knows will not be performed," but "[f]ailure to perform, standing alone ... is not proof that the defendant did not intend to perform." Ala.Code § 13A–8–1(1)(f). Baker contended that the prosecution did not prove a case of theft of property by deception because more than mere failure to perform a promise is required to support an inference of deceptive intent. One of the Baker's prior clients testified that he had not performed the remodeling work on her house as he had promised, despite her advance payment to him of $2,160. The court held that the jury could infer that Baker never intended to perform the contract to reroof the Terrells' house from his failure to perform the initial contractual promise, when combined with his failure to perform the contractual promise to remodel his prior client's home and his failure to perform repeated subsequent assurances regarding the contract to the Terrells. Baker's debt to the Terrells would be nondischargeable in bankruptcy. *See In re Raiford,* 695 F.2d 521 (11th Cir.1983) (debtor's conviction of bankruptcy crime precluded relitigation of factual issues in common between criminal statute and bankruptcy statute permitting denial of discharge where a debtor knowingly and fraudulently makes a false oath or account in connection with the bankruptcy proceeding).

A formal finding that similar acts were committed against Porterfield is of course not necessary in order for the Court to consider Cornner's failure to perform the promise to Porterfield as evidence that he never intended to perform the similar promise made to Dorian. The fraud committed on Porterfield was virtually the same as that committed on Dorian. Cornner obtained a retainer from both, which was unusual in itself, since he testified that he ordinarily received as compensation a percentage fee from the loan proceeds at closing. He promised both that he would either obtain a loan or return the retainer within 20 to 30 days. He did not obtain a loan for either Dorian or Porterfield and did not return either's retainer. He spent both retainers and has no plausible explanation as to how the money was spent in either instance. In each instance, Cornner subsequently engaged in delay and evasive tactics, reassuring both Dorian and Porterfield on numerous occasions that the completion of the promised loans was imminent.

Under the Alabama cases, the fraud committed by Cornner on Porterfield cannot be said to have been so remote in time to the fraud committed

At the time, she and her husband were in financial difficulty, were behind in the payments on their home mortgage, had filed a Chapter 13 case, and were one payment behind on the payment required under their Chapter 13 plan. Her bankruptcy attorney advised her to go to U.S.A. Mortgage Co. She called USA and spoke with the president of the company, Ms. Demetrius Doughty ("Doughty"). Porterfield told Doughty about her financial situation and that she wanted to refinance her mortgage. Doughty told Porterfield that she would need to speak with Cornner in USA's real estate department, as Cornner handled that part of the real estate business for USA. Doughty represented to Porterfield that Cornner was an employee of USA. Porterfield called Cornner that day. They arranged a meeting for that day in Cornner's office.

Porterfield met Cornner at his office which was located different than Doughty's. Cornner's business card identified him as a vice president of USA, and he had a secretary in his office. Porterfield told Cornner of her financial difficulties, and told him that foreclosure on her home was only a couple of weeks away, and that she wanted to save her home, and that she needed to refinance her first mortgage. Porterfield was never asked to fill out any forms by Cornner and never signed any papers. She verbally provided the information requested by Cornner but does not know how much of it he wrote down. At Cornner's request, Porterfield brought him copies of her first mortgage and related papers, as well as copies of pay stubs substantiating her income and her husband's income. Porterfield needed approximately $72,000 to pay off her first mortgage. Cornner told Porterfield that he could find inves-

tors who would actually buy her house, pay off the first mortgage and lease the house back to her for a year, after which they would transfer the house back to her and, ostensibly, she would pay back the investor's "loan", through USA, over a period of years. The transaction did not contemplate that Porterfield would receive any money from the "loan", but that her existing first mortgage would be satisfied and she would be able to save her home from foreclosure. Cornner asked Porterfield for money up front, but was unspecific as to the amount he needed, indicating that it should be whatever she could come up with. He told her that he needed the money to get the loan and that the money would go into her "escrow account," and that she would not have to put up any more money. Cornner told her that his fee would come out of the money and that the remainder would be applied to the purchase price of the house, but he was unspecific as to how much his fee would be.

Porterfield wrote Cornner a cashier's check for $4,000. When she gave him the check, Porterfield told Cornner that she wanted something in writing. Cornner then wrote out an agreement where he promised that if the transaction which he had agreed to arrange for her was not completed within 30 days, he would give the $4,000 back to her.

Over the next several months, Porterfield had approximately 10 meetings with Cornner and spoke with him over the phone on many occasions. When she called his office, the phone was answered "USA Mortgage." Cornner kept assuring her that the loan would come through and "would be finalized in 24 hours." Cornner did not obtain the promised investors or a loan of any other sort for Porterfield. Porterfield finally realized that the promised loan was not forth-

---

on Dorian as to be immaterial to the question of intent in this case. The fraud against Porterfield occurred in December 1992 or January 1993; approximately one year and four or five months after the fraud against Dorian. In *Shoals Ford, Inc. v. McKinney*, 605 So.2d 1197 (Ala.1992), the Alabama Supreme Court held that testimony concerning other fraudulent acts of an automobile dealer was admissible even though the other acts occurred five months before and nine months after the fraud at issue in that case. In

*Harris v. M & S Toyota, Inc.*, 575 So.2d 74 (Ala.1991), the court held that the plaintiff could introduce evidence regarding the settlement of a similar fraud claim filed against the defendant by another person two years before the fraud at issue in that case. In *Davis v. Davis*, 474 So.2d 654 (Ala.1985), the court upheld the admission by the trial court of evidence of a similar misrepresentation made by the defendant to a third person ten years after the alleged misrepresentation was made to the plaintiff in that case.

coming when the sheriff served her with an eviction notice in April or May 1993. The next day she went to Cornner's house. That was the last time that she met with him regarding the matter. Cornner did not return the $4,000 to Porterfield.

Cornner acknowledged that he had worked for USA Mortgage for a period of about four to six months and that his superior at USA Mortgage was Demetrius Doughty. Cornner stated that he was not paid a salary at USA Mortgage, but received compensation from commissions based on a percentage of each loan he processed to completion.

Cornner testified on direct examination that he was never paid anything as a result of his efforts to obtain a loan for Porterfield. On cross examination, Cornner admitted that in a deposition taken in connection with this case that he testified that he kept the entire $4,000 received by him from Porterfield and paid none of it to USA Mortgage. Pla.Ex. 1, page 6. Faced with the contradiction between the testimony given by him on direct examination and the testimony given in his deposition, Cornner admitted that he kept all of the money paid to him by Porterfield.

On cross examination, Cornner also testified that when he was first contacted by Porterfield, he was working for USA Mortgage but that when he was paid the $4,000 by Porterfield, he was not working for USA Mortgage. He said he used the $4,000 to cover expenses associated with trying to obtain the loan for Porterfield, but other than long distance phone calls and faxes, Cornner could not say what other expenses were involved. He could say only that he did not spend the money for personal expenses. Similarly Cornner was unable to remember the number or duration of phone calls and faxes he made and received in connection with Porterfield's loan or to provide any sort of itemization of money spent on phone calls and faxes. Cornner admitted that he could not remember with any degree of specificity how the $4,000 was spent and could not say with certainty that the whole $4,000 was spent in connection with Porterfield's loan.

## II. SECTION 523(a)(2)(A)

 Section 523(a)(2)(A) of the Bankruptcy Code makes nondischargeable a debt for obtaining money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretense, a false representation, or actual fraud. In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove: 1) that the debtor made a false representation; 2) that at the time he knew the representation was false; 3) that he made the representation with the purpose and intention of deceiving the creditor; 4) that the creditor relied on the representation and his reliance was reasonably founded; 5) and, that the creditor sustained loss or damage as a result of the representation. *In re Hunter,* 780 F.2d 1577, 1578 (11th Cir.1986). In other words, "The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Id. See also Neal v. Clark,* 95 U.S. 704, 5 Otto 704, 24 L.Ed. 586 (1887); *Gabellini v. Rega,* 724 F.2d 579 (7th Cir.1984); *In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981); *Massachusetts v. Hale,* 618 F.2d 143 (1st Cir.1980); *In re Preston,* 47 B.R. 354 (E.D.Va.1983); *In re Byrd,* 9 B.R. 357 (D.D.C.1981); 124 Cong.Rec. 32399 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6436, 6453 (Statement of Representative Edwards).

## III. CONCLUSIONS OF LAW

Dorian contends that Cornner committed two separate instances of fraud against him; the first is that Cornner induced him to give Cornner $5,000 and the second is that Cornner induced him to wire $25,000 to an entity in Chicago, ostensibly unrelated to Cornner.

### A. First Instance of Alleged Fraud

#### 1. Liability

 As to the first instance, Dorian contends that Cornner promised to provide a loan within 20 days of his receipt of the retainer or to refund the retainer in the event the loan was not made within 20 days. Dorian also contends that at the time the promise was made, Cornner had the present intent not to perform. Such a contention, if proved, would constitute fraud because a

promise to perform an act in the future is a present representation, and if the promise is not ultimately performed, it may constitute fraud if at the time the promise was made, the defendant intended not to do the act promised and intended to deceive the plaintiff. *E & S Facilities, Inc. v. Precision Chipper Corporation,* 565 So.2d 54, 59 (Ala. 1990).

■ Cornner did not provide Dorian with a loan and did not refund Dorian's retainer. And while those facts alone are not sufficient to prove an intention to deceive or an intention not to perform, this Court may, and should, consider them in the context of other facts surrounding Cornner's promise to provide a loan or refund the retainer. See, *Mason and Dixon Lines, Inc. v. Byrd.* 601 So.2d 68, 73 (Ala.1992). In considering those facts along with the other evidence, this Court cannot find that Cornner did not intend to make an effort to find a loan for Dorian, but this Court does find that there is clear and convincing evidence that Cornner's statement that he would return Dorian's retainer if a loan was not provided in 20 days, was false and made with the intent to deceive Dorian.

Cornner and Armstrong were operating their "business" from their homes. They had no staffs. CAPS existed only for about a year, and even though Cornner testified that CAPS was formed for the primary purpose of brokering commercial loans, he acknowledged that CAPS closed no commercial loans during its existence. When asked to recount how many other loans CAPS obtained for people during its existence, Cornner could only say "quite a few." However, when asked the same question at his deposition, Cornner had answered "one or two." Pla. Ex. 1, page 26. Cornner cannot, therefore, claim that he in good faith anticipated an influx of cash from which he expected to reimburse Dorian. What Cornner must have realized is that Dorian would not trust him unless he promised quick results and assured Dorian of the safe return of his $5,000. By his own admission, Cornner promised the return of the retainer so that Dorian would

think that he was "not trying to hook or crook anyone."

Cornner had no experience in obtaining commercial loans and therefore had no reasonable basis upon which to expect quick results for Dorian. The clear import of Cornner's promise is that he would not spend the money, but would put it up for safekeeping and "return" it, upon expiration of the 20 day period. Cornner, instead, spent the money and cannot now, with any semblance of particularity, say how he spent it, although he has attempted to justify the expenditures. His testimony that he spent the $5,000 on long distance phone calls and faxes is, quite simply, incredible, especially considering his testimony that the work he purportedly performed toward getting Dorian a loan consisted merely of meetings with Dorian and long distance phone calls to prospective lenders, and that he performed the work on only 15 to 20 occasions.

Cornner's intent to deceive Dorian is furthermore supported by the fact that Cornner's relationship with Porterfield was almost identical to that of his relationship with Dorian.[5] Cornner told Porterfield that he would return her money if he did not find her a loan within 30 days. Cornner's overall lack of success and experience in the loan brokering business, coupled with the fact that Porterfield was in dire financial straits at the time, indicate that Cornner had no reasonable basis to think that he could get Porterfield a loan at all, much less within the 30 day deadline. He, in fact, neither found Porterfield a loan nor returned her money. He instead spent Porterfield's money and cannot recall how he spent it, except to persistently repeat "long distance phone calls and faxes." He could not, however, enumerate the number of or duration of the calls and faxes he purportedly made or provide any sort of itemization of money spent on phone calls and faxes.

■ Based on the facts of this case, this Court finds that Cornner, at the time he promised Dorian that he would return the retainer at the end of 20 days if a loan was not procured, had no intention of keeping

5. See note 4 above.

that promise, and that the promise was made by Cornner with the intent to deceive Dorian into giving him the $5,000, and that the evidence adduced by Dorian to that effect is clear and convincing.[6] Cornner intended to perpetrate the precise "hook or crook" that he reassured Dorian would not occur, and the debt thereby created is not dischargeable in bankruptcy.

### 2. Damages

#### (a) Actual

Dorian is entitled to actual damages in an amount that would place him in the position he would occupy if the representations had been true, *Morris v. Westbay Auto Imports, Inc.*, 512 So.2d 1373, 1375 (Ala.1987), which, of course, is $5,000; the amount that Dorian would not have given to Cornner but for the promise.

#### (b) Punitive

Because Cornner was guilty of intentional fraud proved by clear and convincing evidence, Dorian is entitled not only to a nondischargeable judgment in the amount of his actual damages, but is, under Alabama law, also entitled to punitive damages. "In Alabama, punitive damages are recoverable where the fraud is committed with the intention to injure and deceive."

*Bracewell v. Bryan*, 57 Ala.App. 494, 498, 329 So.2d 552, 555 (Ala.Civ.App.1976). Such an award would also be nondischargeable. *In re St. Laurent*, 991 F.2d 672, 677 (11th Cir. 1993). There is no convenient meter or scale upon which punitive damages may be measured and meted out. The determination of the appropriate award of punitive damages lies in the discretion of the fact finder. *Southern Life and Health Insurance Co. v. Turner*, 586 So.2d 854, 857 (Ala.1991). The discretion of the fact finder, however, is not unfettered, and must be exercised toward the accomplishment of a purpose and in consideration of several factors. The purpose of an award of punitive damages is punishment of the wrongdoer and deterrence of similar wrongful conduct by him or others. Gamble, Alabama Law of Damages 27 (3rd ed. 1994). In fashioning an award to accomplish that purpose, the fact finder must consider the enormity of the wrong perpetrated, the culpability of the wrongdoer, and the necessity of preventing similar wrongs. *Southern Life and Health Insurance Co.*, 586 So.2d at 857.

Cornner intentionally defrauded Dorian for personal gain. His conduct was odious and demands punishment. Towards this objective, this Court will award punitive damages against Cornner in this case in the amount of $5,000.00.[7]

---

**6.** In order to be awarded compensatory damages, a plaintiff must prove fraud by a preponderance of the evidence. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1320 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Hines v. Riverside Chevrolet–Olds, Inc.*, 655 So.2d 909, 925–26 (Ala. 1994); *Hearing Systems, Inc. v. Chandler*, 512 So.2d 84, 88 (Ala.1987); *Alabama Farm Bureau Mutual Insurance Service, Inc. v. Englezos*, 479 So.2d 1142, 1145 (Ala.1985); *Purcell Co. v. Spriggs Enterprises, Inc.*, 431 So.2d 515, 519 (Ala. 1983); *Universal Brokers v. Higdon*, 56 Ala.App. 184, 320 So.2d 690, 693 (Civ.App.1975). The same standard of proof applies to dischargeability issues in bankruptcy. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *In re Miller*, 39 F.3d 301, 304 (11th Cir.1994); *In re St. Laurent*, 991 F.2d 672, 676 (11th Cir.1993); *In re Yanks*, 931 F.2d 42, 43 (11th Cir.1991). However, under Alabama law, in order to be awarded punitive damages, the plaintiff must prove intent to deceive by clear and convincing evidence. Ala.Code § 6–11–20(a) provides that, other than in a wrongful death suit, "[p]unitive damages may not be awarded in any civil action ... other than in a

tort action where it is proven by clear and convincing evidence that the defendant consciously and deliberately engaged in oppression, fraud, wantonness, or malice in regard to the plaintiff." The term "clear and convincing evidence" is defined as "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." Ala.Code § 6–11–20(b)(4). "Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." *Id.*

**7.** The amount awarded is designed to punish Cornner for the wrong done by him to Dorian and to deter Cornner from defrauding others. An award of a lesser amount would not serve to sufficiently discourage Cornner. On the other hand, this Court must consider that a punitive award should not financially cripple Cornner or constitute a life long financial burden on him. In relation to other punitive damage awards which have been upheld by the Alabama appel-

## B. Second Instance of Alleged Fraud

As to the second instance of alleged fraud, Dorian contends Cornner induced him to wire money to Chicago. As to this instance, Cornner must prevail.[8] First of all, it is difficult to determine whether Cornner's statements to Dorian were in the nature of unqualified representations or were more in the nature of second hand opinions or judgments. Dorian said that Cornner told him that the certificate was a legitimate document and that it could be cashed on the maturity date. Cornner said that he told Dorian that the certificate of deposit was, *to the best of his knowledge,* "good." Consider-

ing the fact that Dorian had no basis for believing that Cornner had personal knowledge regarding the authenticity of the certificate, Cornner's version of the representation is the most plausible.[9] Therefore, Cornner's statement was not necessarily false, even though the certificate later turned out to be worthless. "[F]raud will not be implied when the circumstances from which it is supposed to arise may reasonably be consistent with honest intention." *Macon v. Alabama Mineral Land Co.,* 295 Ala. 222, 225, 326 So.2d 715 (1976).

Even if Cornner made an unqualified representation to Dorian regarding the authen-

late courts, an award in this case of punitive damages in an amount equal to two times the amount of the award of compensatory damages is not out of line. *See, e.g., Southern Life and Health Insurance Co. v. Turner,* 586 So.2d 854 (Ala.1991) ($1,000 in compensatory damages and $499,000 in punitive damages); *Kabel v. Brady,* 519 So.2d 912 (Ala.1987) ($609 in compensatory damages and $161,891 in punitive damages); *Principal Financial Group v. Thomas,* 585 So.2d 816 (Ala.1991) ($1,000 in compensatory damages and $750,000 in punitive damages), *cert. denied,* 502 U.S. 1009, 112 S.Ct. 649, 116 L.Ed.2d 666 (1991); Jane Massey Draper, Annotation, *Excessiveness or Inadequacy of Punitive Damages in Cases Not Involving Personal Injury or Death,* 14 A.L.R.5th 242 (1994) (Alabama cases summarized).

In *Green Oil Co. v. Hornsby,* 539 So.2d 218 (Ala.1989), the Alabama Supreme Court suggested that a trial court should also take into consideration the following factors in determining whether a jury award of punitive damages is excessive or inadequate:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

539 So.2d at 223–224.

To the extent allowed by the evidence produced at trial, this Court has considered the factors enumerated in the *Green Oil Co.* case, in fixing the amount of punitive damages against Cornner.

**8.** So as to avoid confusion, this Court reiterates that the proper standard of proof for a fraud liability issue under state law and for a dischargeability issue in the bankruptcy court is "preponderance of the evidence." The finding of this Court is, therefore, that, as to the money wired by Dorian to Chicago, Dorian failed to prove by a preponderance of the evidence submitted that Cornner intended to deceive him or that he justifiably relied on the statements made by Cornner regarding the certificate. Had Dorian been successful in proving by a preponderance of the evidence that Cornner intentionally deceived him regarding the certificate, this Court would be authorized to award a nondischargeable judgment for actual damages incurred by Dorian, but could only award punitive damages if the evidence of Cornner's fraud had been, in addition, clear and convincing. See Footnote 6 above and cases cited therein.

**9.** "Fraud must be affirmatively proven, and not presumed. If there is room for an inference of honest intent, the question of fraud must be resolved in favor of the debtor." *In re Hunt,* 30 B.R. 425, 436 (M.D.Tenn.1983). *See also, In re Mettetal,* 41 B.R. 80, 87 (Bankr.D.Tenn.1984); *In re Rauch,* 18 B.R. 97 (Bankr.W.D.Mo.1982).

ticity of the certificate, there is no proof that Cornner knew that the statements were false or that he did not in good faith actually believe the statements to have been true when he made them.[10] No evidence was offered which indicates that Cornner had any reason to suspect that the certificate of deposit was worthless. No evidence was presented which tended to establish a conspiracy between Cornner and Noel or between Cornner and Group Marchant to defraud Dorian. Cornner's uncontroverted testimony that neither he nor Armstrong received any portion of the money indicates that Cornner had no reason to lie to Dorian about the authenticity of the certificate.

▬ If, however, Cornner made an unqualified representation to Dorian regarding the authenticity of the certificate, his representation could be characterized as reckless, and therefore actionable. Cornner admitted that he did not know whether the certificate of deposit was authentic or not. Despite that fact, Cornner, according to Dorian, said that the certificate was valid and authentic. Actual fraud is committed when one makes representations relied upon by another without knowing or caring whether they are true or false. *International Resorts, Inc. v. Lambert,* 350 So.2d 391, 394 (Ala.1977); and, "He who affirms either what he does not know to be true, or knows to be false, to another's prejudice and his own gain, is, both in morality and law, guilty of falsehood, and must answer in damages." *Benefield v. Dailey,* 33 Ala.App. 376, 377, 34 So.2d 26, 27 (Ala.Ct.App.1948). A false statement made with reckless disregard for the truth or falsity of the statement would constitute a "false representation" under § 523(a)(2)(A) of the Bankruptcy Code. *Birmingham Trust National Bank v. Case,* 755 F.2d 1474, 1476 (11th Cir.1985).[11]

But even if this occurred, in order to rule in Dorian's favor the Court must find that Dorian actually relied on the representations made by Cornner. Based on the facts, the Court cannot make such a finding.

Noel is the acknowledged source of the certificate of deposit and discussed the certificate of deposit with Dorian prior to Cornner's arrival at the meeting. Dorian is an experienced and sophisticated independent businessman. He had the same opportunity to examine the certificate that Cornner had. Dorian had no reason to believe that Cornner knew anything more about the certificate than Noel may have related to him or that Cornner had otherwise acquired any peculiar knowledge regarding the authenticity of the certificate. Indeed, Dorian had no reason to believe that Cornner was in any better position to form a judgment regarding the authenticity of the document than he was. Under those circumstances, it is implausible to believe that Dorian actually relied upon Cornner's statements regarding the authenticity of the certificate. In fact, the evidence is more consistent with the proposition that Dorian relied on the representations made to him by Noel regarding the authenticity of the certificate.

▬ Even if Dorian had in fact relied upon the statements made by Cornner, his reliance was unjustified. Dorian knew that Cornner did not have first hand knowledge regarding the authenticity of the certificate. "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." *Hall v. Gaines,* 613 So.2d 370, 371–372 (Ala.1993). Very simply, Dorian

---

**10.** Constructive fraud, that is, a misrepresentation made without the intent to deceive, or without knowledge that the representation was false, is actionable under Alabama law. *First National Bank of Auburn v. Dowdell,* 275 Ala. 622, 627, 157 So.2d 221 (1963). Constructive fraud will not, however, support an award of punitive damages, *Tallant v. Grain Mart, Inc.,* 432 So.2d 1251, 1254 (Ala.1983), and a debt based on constructive fraud is dischargeable in bankruptcy. *In re Armstrong,* 54 B.R. 399, 403 n. 5 (Bankr.N.D.Ala. 1985).

**11.** Such a statement would also merit an award of punitive damages. *Cooper Chevrolet, Inc. v. Taliaferro,* 439 So.2d 158, 159 (Ala.Civ.App. 1983).

knew that Cornner did not have any great knowledge about the certificate, and that anything Cornner said on the subject should be given little weight.[12] Dorian has not proved fraud in this instance.

## IV. CONCLUSION

Based upon the foregoing, the Court finds that Cornner owes a debt to Dorian in the amount of $10,000 and that, pursuant to 11 U.S.C. § 523(a)(2)(A), the debt is not dischargeable in bankruptcy. A separate order and judgment will be entered in accordance with this memorandum opinion.[13]

### *ORDER AND JUDGMENT*

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED, ADJUDGED AND DECREED** that:

1. Judgment is entered in favor of the Plaintiff and against the Defendant–Debtor.
2. Judgment is entered in favor of the Plaintiff in the amount of $10,000, representing compensatory damages of $5,000 and punitive damages of $5,000.

3. The Judgment of $10,000 entered in favor of the Plaintiff is not dischargeable in this or any other bankruptcy case filed by the Debtor.

---

**12.** The Court recognizes that Alabama operates under the "justifiable reliance" standard rather than the old "reasonable reliance" standard. The finding herein is not based upon a determination that Dorian did not "reasonably" rely on the statements made by Cornner regarding the authenticity of the certificates, but is based upon a determination that Dorian *did not in fact rely* on the statements made by Cornner regarding the authenticity of the certificates. The reasonableness or unreasonableness of the plaintiff's conduct may be considered evidence from which it may be inferred that he did not in fact rely on the representations made by the defendant or that the representations were patently false:

> Not only must there be reliance, but the reliance must be found to be justifiable under the circumstances. The plaintiff's conduct must not be so utterly unreasonable, in light of the information open to him, that the law may properly say that his loss is his own responsibility. In some cases, of course, the unreasonableness of his conduct has been regarded as sufficient evidence that he did not in fact rely upon the representation—he may testify to his reliance, but the court or the jury is not compelled to believe him. But in some cases where the plaintiff's reliance in fact, and his good faith, are unquestioned, it may still be held that his conduct was so foolish as to bar his recovery. If he is a person of normal

intelligence, experience and education, he may not put faith in representations which any such normal person would recognize at once as preposterous, as, for example, that glasses, once fitted will alter shape and adapt themselves to the eye, or which are shown by the facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth, and still compel the defendant to be responsible for his loss.

William L. Prosser, Law of Torts 715–716 (4th ed. 1971).

**13.** The parties have submitted all issues regarding liability, damages, and dischargeability for resolution by the bankruptcy court. Neither party requested a jury trial on any issue, nor has either party questioned the jurisdiction or authority of the bankruptcy court to decide any issue submitted. The Court specifically finds that it has the requisite jurisdiction under 28 U.S.C. § 157(b)(1) and (2)(I) to determine not only the dischargeability of the debt owed by Cornner to Dorian, but also to determine the existence and validity of the debt and to render a money judgment based upon Dorian's state law fraud claim. *See In re McLaren*, 3 F.3d 958, 965–966 (6th Cir.1993); *In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir.1991); *In re Vickers*, 546 F.2d 1149, 1151 (5th Cir.1977).