**In re Honey GILMORE, Debtor.**

**FCC NATIONAL BANK dba First Card, Plaintiff,**

v.

**Honey GILMORE, Defendant.**

**Bankruptcy No. 97–03612–BGC–7. Adversary No. 97–00383.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

June 17, 1998.

David Gespass, Birmingham, AL, for Debtor.

McCollum Halcomb, Birmingham, AL, for Plaintiff.

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE DISCHARGEABILITY

BENJAMIN COHEN, Bankruptcy Judge.

The matter before the Court is the 11 U.S.C. § 523(a)(2)(A), *Complaint for Nondischargeability* filed on August 18, 1997, by the plaintiff, FCC National Bank doing business as First Card. After notice, a trial was held on February 17, 1998. McCollum Halcomb, the attorney for the plaintiff; David Alan Gespass, the attorney for the debtor; and the Chapter 7 debtor, Honey Gilmore, appeared. The matter was submitted on the testimony of Ms. Gilmore, various exhibits admitted into evidence, arguments and briefs of counsel, and the record in this case.

The debtor contends that her debt to the plaintiff is dischargeable. The plaintiff contends that the debt is nondischargeable. The plaintiff argues that the debtor had no intent to repay the charges the debtor made on the plaintiff's credit card and in particular that the debtor had no intent to repay charges made to that card which were associated with the debtor's hobby of raising domestic cats and entering those cats in competition.

### I. FINDINGS OF FACTS

#### A. Ms. Gilmore's Employment, Income and Debts

Ms. Gilmore is employed as an "administrative assistant to the Assistant Vice President over the conforming wholesale division" for New South Federal Savings Bank, a mortgage lending institution in Birmingham, Alabama. She has held that position for four years. In her most recent years, from August 1996 through March 1997 her net wages were $550.00 bi-weekly, and her net wages are now, and have been since April 1, 1997, $670.00 bi-weekly.

Ms. Gilmore's duties include producing marketing flyers and assisting the bank's production manager and staff. She also administers the broker approval process, which

involves processing applications made by mortgage brokers for underwriting loans and involves investigating the credit references of those mortgage brokers.

Credit card debts comprise the majority of Ms. Gilmore's debts. That majority totals $29,055.20 and is owed to four credit card companies. Specifically, Ms. Gilmore owes $5,016.89 to the plaintiff, First Card; $10,-861.99 to City Bank; $8,132.89 to First Union; and $5,043.43 to People's Bank. All were scheduled by Ms. Gilmore in her bankruptcy petition. First Card is the only creditor filing a dischargeability complaint.

Ms. Gilmore was married in October 1996. She and her husband separated on March 19, 1997. They divorced sometime after Ms. Gilmore filed her Chapter 7 bankruptcy petition.

Ms. Gilmore's former husband had charging privileges on the City Bank card but none others. He was not contractually liable on any.[1]

### B. Ms. Gilmore's Hobby

Ms. Gilmore enjoys raising cats and entering them in cat shows. She has, in fact, been "showing cats" since 1990. This is her hobby, but it is the major reason for her current financial crisis.

Ms. Gilmore owns a cat named Ollie. She and her husband acquired Ollie on July 1, 1995 when Ollie was an eight month old kitten. Ollie was at the time, in Ms. Gilmore's words, "darn cute," apparently the only justification Mr. and Ms. Gilmore needed to decide to enter Ollie in a series of competitions, or cat shows.[2] As it turned out, their decision was a good one; but it was also a costly one.

In his first show, Ollie was named "third best household pet kitten in the southeast region."[3] With this success, Ms. Gilmore decided to show Ollie as an adult cat. In his first adult show, Ollie finished second (only to the cat that had won best international household pet several years before) in the "best household pet" category. Given this success, Ms. Gilmore entered Ollie in six more shows that season. At the end of that season in the spring of 1996, Ollie was recognized, in his category, as the fourth best adult cat in the southeast region.

Ollie's success fueled Mr. and Ms. Gilmore's enthusiasm. In the spring of 1996, they determined that they would show Ollie as many times as possible during the 1996–1997 cat show season, a season from May 1996 through April 1997. Their goal was best household adult cat in the southeast region.

During the 1996–1997 show season, Ms. Gilmore, sometimes accompanied by her husband, entered Ollie in, and attended 24 cats shows. Some of the shows were local, or "drive" shows (as described by Ms. Gilmore), that is they were held in Alabama or nearby states. For these shows, Ms. Gilmore, and sometimes her husband, would travel by car, limiting their expenses to entry fees, gasoline, hotels, and meals. But Ms. Gilmore also attended many other shows around the country, which required *travel by commercial airlines*. The expenses for these non-local shows included, entry fees, gasoline, hotels and meals, *plus airfares* and rental cars. During the year and a half preceding bankruptcy, Ms. Gilmore attended cat shows in Houston, Texas; Denver, Colorado; Philadelphia, Pennsylvania; Alexandria, Virginia; Bay St. Louis, Missouri; Chicago, Illinois; Monterey, California; Lafayette, Louisiana; Secaucus, New Jersey; Orange Park, Florida, and Spokane, Washington.[4]

Mr. and Ms. Gilmore showed Ollie as an adult cat from the beginning of 1996 through

---

1. Mr. Gilmore's charges on the First Card account comprise only a small amount of the total debt owed on that card.

2. Quotations from Ms. Gilmore's testimony are from official tape recordings made by personnel of this Court's office of clerk.

3. Ollie was a household cat. Ms. Gilmore testified that she did not expect to win or earn anything substantial even if Ollie were successful.

4. Ms. Gilmore testified that like many similar competitions, the political atmosphere of the cat show circuit required her to show Ollie so that he would be recognized by the competition community and the judges and thus would receive the benefit of familiarity.

April 1997. According to Ms. Gilmore's testimony, they financed Ollie's campaign through the use of Ms. Gilmore's credit cards. Those charges constituted the bulk of her credit card debt and at the point in October 1996 that Ms. Gilmore began using the plaintiff's card, *she owed almost $22,000.00 on three other credit cards.* The individual card balances included $4,838.71 to People's Bank; $9,228.10 to CitiBank; and $7,899.50 to First Union. From October 23, 1996, the date Ms. Gilmore first used the First Card, to May 3, 1997, the date she last used the First Card (a period of approximately 8 months) Ms. Gilmore charged purchases, on the First Card, totaling $5,022.29, and made payments to the debt on that card of $585.00. During this same eight month period, Ms. Gilmore charged $3,190.54 to her other three cards, including $893.41 to her People's Bank card, $1,836.38 to her CitiBank card, and $460.75 to her First Union card.

First Card revoked Ms. Gilmore's charging privileges by letter, dated June 6, 1997.

### C. Findings Regarding the Plaintiff's Solicitation of Ms. Gilmore's Participation in its Credit Card Business

Specific findings of fact regarding the plaintiff's encouragement of Ms. Gilmore's use of its credit card are discussed below in connection with this Court's conclusions of law. Generally, the Court finds that the plaintiff induced Ms. Gilmore to receive its credit card, persuaded her to use the card and encouraged her to borrow the full amount of her credit limit.

## II. THE PLAINTIFF'S CONTENTION: PROMISSORY FRAUD

Section 523(a)(2)(A) makes debts incurred as a result of a debtor's false representation, false pretenses or actual fraud, non-dischargeable. *Under a traditional analysis of that section,* to have a debt declared non-dischargeable pursuant to that section, a creditor must prove that "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." *Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347, 350 (11th Cir.1996).

*The plaintiff relies on this analysis* and contends that each time Ms. Gilmore used her credit card, that she made an implied representation to the plaintiff that she would repay the money loaned for that purchase. The plaintiff's theory is one of promissory fraud. "[A] promise to perform an act in the future is a present representation, and if the promise is not ultimately performed, it may constitute fraud if at the time the promise was made, the defendant intended not to do the act promised and intended to deceive the plaintiff." See this Court's opinion in *Dorian v. Cornner (In re Cornner),* 191 B.R. 199, 210 (Bankr.N.D.Ala.1995), citing *E & S Facilities, Inc. v. Precision Chipper Corp.,* 565 So.2d 54, 59 (Ala.1990).[5]

---

**5.** The goal of the trier of fact in a fraud action is to determine the defendant's subjective intent. But because the trier of fact cannot know the thoughts in a defendant's mind, the solution many courts have employed is to allow intent to be proved or disproved by objective facts. Certainly, without this, or some similar solution, fraud could never be proved, absent an admission on the part of the defendant of an intent to defraud, an unlikely occurrence. In regard to cases like the instant one, the issue then becomes whether the debtor had the intent to repay credit card charges when those charges were made. In turn, courts considering that question then consider, if there is a finding that there was no intent, whether or not the debtor's lack of intent to honor the implied promise to pay requires a determination under section 523(a)(2)(A) that the debt owed, as the result of the failure to abide by that promise, is non-dischargeable in bankruptcy.

As discussed above, during the 8 month period Ms. Gilmore incurred the debt owed to the plaintiff, her net income was $1,100.00 per month. Her husband's net income was similar.

Ms. Gilmore testified that her current monthly living expenses, as a single person living alone, are $1,282.66. This amount includes rent, utilities, a car payment, food, laundry, clothing, recreation, life insurance and automobile insurance. She testified further that when she and her husband were together, which was for most of the eight month period under scrutiny, their combined monthly expenses were $2,200.00, or about the combined sum of their monthly wages. That amount included however approximately $590.00 per month Ms. Gilmore paid on her four credit card accounts. Those "minimum monthly

payments" included $220.00 to CitiBank, $160.00 to First Union, $150.00 to People's Bank, and an average of $60.00 to First Card. Unfortunately, these "minimum monthly payments" were consumed by the accretion of monthly finance charges so that there was no appreciable reduction of the principal balances for any of the cards. And whatever minuscule reduction of principal that might have occurred from the application of those payments was thwarted by the continuing increase in principal as the result of additional purchases made by Ms. Gilmore with the cards.

This Court must conclude, as a matter of fact, that Ms. Gilmore had no money, over and above her monthly living expenses (including the debt service on her other three credit cards), with which to pay any debt that she would subsequently have incurred to First Card. Ms. Gilmore therefore completely lacked the ability to repay that debt from either her future earnings or earnings in combination with her former husband's earnings, a situation that existed even before she made any charges on the plaintiff's credit card. In other words, when Ms. Gilmore made her first use of the plaintiff's credit card, she already owed more credit card debt than she could ever realistically hope to repay. Certainly she could not have expected to repay the plaintiff from her earnings since those earnings were barely sufficient to provide basic living necessities. Nor could she have expected to repay the plaintiff from earnings combined with her husband's, since those combined earnings were barely sufficient to pay basic living expenses and make debt service on the credit card debt that existed before she incurred any debt to the plaintiff.

In contrast, the debtor testified that she always intended to pay the plaintiff. And, indeed, while she and her husband were together, they were able to make the minimum monthly payments on their credit card debt. But, at the same time, the debtor was still making significant charges to her credit accounts and the minimum payments she was making were barely sufficient to satisfy the debt service, much less reduce principal. At the minimum payment rate, the time required to repay the debt would be considerable, during which time the debtor would only be able to afford basic living expenses as a single individual or shared expenses if she and her ex-husband were still together. It is, therefore, difficult to believe that the debtor, who had shown no financial restraint during the years preceding bankruptcy, genuinely intended an immediate change in her spending habits.

Ms. Gilmore testified that she did intend to obtain, after the 1996–1997 cat show season, a debt consolidation loan to pay all of her credit card debt, including the debt owed to First Card, although she recognized that she was, at the time the charges were made, unable to pay those charges. According to Ms. Gilmore, she and her husband decided, in either the spring or fall of 1996, to use her credit cards to finance Ollie's campaign through the end of the season in April 1997, and then to seek a loan to pay off those credit card debts. Ms. Gilmore and her husband were totally committed to the goal of having Ollie crowned the best in the southeast, and decided that, in her words, "no matter what, we would pursue that goal" because they believed that "the cat was worth showing."

Ms. Gilmore testified that in February 1997 she and her husband applied for a debt consolidation loan but that the loan was not approved because they had no collateral to pledge.

Ms. Gilmore testified also that, after being turned down for the debt consolidation loan in February, she applied in March or April to her own credit union for a similar loan, but was likewise turned down, purportedly for the same reason, a lack of collateral.

As a third alternative Mr. and Ms. Gilmore sought assistance from Mr. Gilmore's father, who, as executor for his aunt's estate, held money in a certificate of deposit. According to Ms. Gilmore, her husband's father consented to pledge the certificate of deposit as collateral for their debt consolidation loan. However, he withdrew that offer once he was informed by Ms. Gilmore that she and his son were having marital difficulty. At that point, Ms. Gilmore's father-in-law decided to hold his offer in abeyance for a time until Ms. Gilmore and her husband could determine whether or not they would stay married. Ms. Gilmore testified:

> In February of 1997, we realized that we needed to go ahead and act on the debt consolidation. All of the plane tickets save one that was an emergency, emergency purchase in cat show terms, in that I realized I needed the points at that show, had been purchased. We felt like there wouldn't be much else we would have to put on the cards, especially if we could get a debt consolidation and reduce our total monthly credit payments that would free up enough cash for hotel and dinner on the trips. So in the middle of February we sought a debt consolidation loan. The bank told us that we could not get one without something to securitize it. We had nothing with which to securitize the debt consolidation loan. My father-in-law stepped forward and as trustee of a certificate of deposit for a family member that he was executor of her estate offered that as security for the debt consolidation loan. That was in the middle of February 1997. At that point we [she and her husband] still lived together for another month and of course we felt that it would be inappropriate to let my father-in-law make that commitment without knowing that we had already been having a little bit of marital difficulty and that I had been seeking counseling and had tried to encourage my husband to go with me. And so he decided he would put it in thirty day renewable and see what happened in 30 days. That was from the middle of February until the middle of March.

See note 2 (parenthetical added). In March, Ms. Gilmore's husband moved from the home they shared. And in May, since Ms. Gilmore and her husband were still separated, her father-in-law withdrew his offer.

## III. CONCLUSIONS OF LAW

Notwithstanding the plaintiff's contentions, for the three independent reasons discussed below, the Court concludes that Ms. Gilmore's debt to the plaintiff is dischargeable. Those reasons are: (A) Binding precedent requires dischargeability; (B) The plaintiff consented to Ms. Gilmore's charges; and (C) The plaintiff is estopped from relying on the evidence presented to demonstrate that Ms. Gilmore acted in a fraudulent manner.

### A. Binding Precedent—*First Nat'l Bank of Mobile v. Roddenberry*

■ In *First National Bank of Mobile v. Roddenberry (In re Roddenberry)*, 701 F.2d 927 (11th Cir.1983), the Court of Appeals for the Eleventh Circuit held that regardless of a debtor's intent to repay, or lack thereof, debts incurred by a debtor's use of credit cards prior to revocation of the debtor's charging privileges are dischargeable. Since all of the charge's made by Ms. Gilmore on

the card issued to her by the plaintiff were made prior to June 6, 1997, the date the plaintiff revoked Ms. Gilmore's charging privileges and communicated that revocation to her, the debt owed by Ms. Gilmore for those charges is dischargeable.

#### 1. *Roddenberry* is Applicable to Cases Filed Under the Bankruptcy Code

*Roddenberry* was decided prior to enactment of section 523(a)(2) of the Bankruptcy Code and during the operation of section 17(a)(2) of the Bankruptcy Act. The question frequently asked is, because section 523(a)(2)(A) of the Bankruptcy Code is different from the predecessor section 17(a)(2) of the Bankruptcy Act, in that section 503(a)(2)(A) contains the term "actual fraud" in addition to the section 17(a)(2) terms "false representations" and "false pretenses," does *Roddenberry* remain binding precedent in

This Court has not placed much weight on this pillar of the debtor's defense as the debtor's testimony regarding her former father-in-law's offer to pledge collateral does not support her position. The debtor and her husband did not spend the plaintiff's money based on the alleged expectation that the father-in-law would pledge collateral for a debt consolidation loan, but rather on the expectation that they, based on their own credit and ability to pay, would be able to obtain an unsecured debt consolidation loan. The father-in-law's offer of collateral was not made until after their attempt to obtain an unsecured loan had been rejected and they had been informed by the bank that collateral would be necessary. While the general idea of a consolidation loan could have been a factor in the couple's decision, since the debtor did not know about the possibility of her father-in-law's offer of collateral until after she had made most of the charges which comprise the debt owed to the plaintiff, her purported intent to repay could not possibly have been based on her knowledge of that possibility.

Ms. Gilmore's testimony is grounded on the belief that she and her husband could qualify for an unsecured loan in the approximate amount of $30,000, at the time she allegedly formed the intent to obtain such a loan. However, their limited financial resources, lack of property to offer as collateral, and spending history should have provided sufficient reason for them to doubt their ability to obtain such a loan. The fact that their loan application was refused could not have

been a surprise to them, especially Ms. Gilmore, who was not financially unsophisticated, as she worked for a financial institution, in the business of lending money, and whose duties involved processing the credit applications of loan brokers.

Other facts detract from the debtor's testimony that she intended to repay her credit card debt. The debtor incurred the debt to the plaintiff over a relatively brief period of time and within only a short period prior to filing bankruptcy. The debtor incurred the debt to the plaintiff when she was already deeply in debt. She had reached the credit limits on several other credit cards when she began charging on the plaintiff's card and did not stop using the plaintiff's card until she had reached the credit limit on that card. And the majority of the charges made by the debtor on the plaintiff's card were for items related to her expensive hobby.

This Court must conclude that the debtor continued making charges on the plaintiff's card, and on her other cards as well, after she and her husband were turned down for a consolidation loan, and after her marital difficulties had begun, when it should have been apparent to her that she would be unable to obtain a consolidation loan and unable to rely on financial help from her husband.

In the matter before this Court, however, the Court believes that it should depart from the above analysis, and for the reasons expressed in this opinion find that the debt to the plaintiff is dischargeable.

this Circuit? [6] The answer is yes for at least three reasons.[7]

■ One, precedent from both the Supreme Court of the United States and the Court of Appeals for the Eleventh Circuit dictate that great *deference is to be given to decisions made under the provisions of the Bankruptcy Act*, and that those decisions, *absent express Congressional intent otherwise*, should control the same issues that arise under the Bankruptcy Code.[8] In regards to comparison of section 523(a)(2) and 17(a)(2), the Act issues and the Code issues are certainly the same and there has been no Congressional expression that the treatment of those same issues should be different.[9] Similarly, there is no reference in the legislative history of section 523(a)(2)(A) to either *Roddenberry* or credit card promissory fraud, or any other indication that Congress intended to address the issues discussed by the court in *Roddenberry* by inclusion of the term "actual fraud" in section 523(a)(2)(A).

■ Two, the legislative history of section 523(a)(2)(A) indicates that the term "actual fraud" was included in that section, not to expand or define the manner of frauds that might fall within the operation of the non-dischargeability statute, but to clarify and emphasize the fact that only debts resulting from fraud intended to deceive, or frauds involving moral turpitude, are non-dischargeable, and not debts resulting from constructive fraud or fraud implied in law. The House Report discussing the section explains that "Subparagraph (A) is intended to codify current case law e.g., *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1887), which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." H.R. Rep. 95-595, 549, 95th Cong., 1st Sess., reprinted in 1978 U.S.C.C. & A.N. 5963 (1977).

Three, there is no substantive difference between section 17(a)(2) and section 523(a)(2)(A).

The term "actual fraud" in section 523(a)(2)(A) is, except to exclude constructive fraud from the operation of the statute, redundant, since it does not encompass or define any conduct or activity that was not otherwise encompassed within or defined by the terms "false representation or false pretenses." It is, in fact, difficult to find a definition of "actual fraud" that does not include the words "false representation" or "false pretenses," or synonymous terms, or which does not mirror the elements of the terms that appeared in section 17(a)(2) of the Act when *Roddenberry* was decided.

6. Section 17(a)(2) of the Bankruptcy Act reads, "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... are liabilities for obtaining money or property by false pretenses or false representations...." Bankr.Act, § 17(a)(2), 11 U.S.C. § 35(a)(2) (1976).

Section 523(a)(2) of the Bankruptcy Code reads, a "discharge ... does not discharge an individual debtor from any debt ... for money, ... to the extent obtained, by ... false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2).

7. If *Roddenberry* is not binding precedent in this Circuit, that court must decide so. As that court noted in its opinion, "we express no opinion with respect to this construction [that the addition of 'actual fraud' distinguishes section 523(a)(2) from section 17(a)(2)] of section 523(a)(2)(A)." *Roddenberry* at 929 n. 3 (parenthetical added). That court has not, since making that statement, addressed the issue; consequently, for the reasons discussed above, *Roddenberry* is the controlling law in this Circuit on the issue of whether credit card debts alleged to be based on fraud are dischargeable in bankruptcy.

8. "Silent abrogation of judicially created concepts is particularly disfavored when construing the Bankruptcy Code." *Varsity Carpet Services v. Richardson (In re Colortex Industries, Inc.)*, 19 F.3d 1371, 1375 (11th Cir.1994)(citing *Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)). " 'We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.' " *Id.* (quoting *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codification." *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 679 (11th Cir.1993)(quoting *Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)).

9. "Since the differences between § 523(a)(2)(A) and its predecessor, § 17(a)(2) of the Bankruptcy Act, are negligible, case law construing § 17(a)(2) serves as a useful guide in applying § 523(a)(2)(A) of the Code." *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985).

Black's Law Dictionary, which was adopted by the *Collier on Bankruptcy* treatise after enactment of the Code and thereafter adopted by many bankruptcy courts, contains information most popular among those who seek to distinguish "actual fraud" from "false representation or false pretenses." That is, "Actual fraud consists in deceit, artifice, trick, design, some direct and active operation of the mind; it includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another. It is something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." Black's Law Dictionary 661 (6th ed.1990), *cited in* 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 523.08[5], pg. 523–51 n. 24 (15th ed.1996). But even that definition, which is not based on legislative history or bankruptcy case law decided under the Bankruptcy Act, does not expand the scope of the already broad penumbra of activities included within the terms "false representation or false pretenses." " '[F]alse pretenses or false representations' means *any conduct tantamount to fraud....* " *Beneficial Fin. Co. of Jersey City v. Norton,* 76 N.J.Super. 577, 185 A.2d 218, 221 (1962)(emphasis added).

 Under the Bankruptcy Act, the term "false representation" was specifically used to refer to express misrepresentations, while the term "false pretenses" was specifically used in reference to implied misrepresentations or any "conduct intended to create and foster a false impression." *United American Bank v. Parker (In re Parker),* 1 B.R. 176, 179 (Bankr.E.D.Tenn.1979). The concept of "false pretenses" is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses "may be implied from conduct or may consist of concealment or non-disclosure where there is duty to speak, and may consist of any acts, work, symbol or token calculated and intended to deceive." Black's Law Dictionary 602 (6th ed.1990). It is "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction,

by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor." *Sterna v. Paneras (In re Paneras),* 195 B.R. 395, 406 (Bankr. N.D.Ill.1996). Silence or concealment as to a material fact can constitute false pretenses. *Bank of Miami v. Quintana (In re Quintana),* 4 B.R. 508, 510 (Bankr.S.D.Fla.1980). In short, false pretenses "can be made in any of the ways in which ideas can be communicated." *First Nat. Bank of Webster v. Aetna Cas. & Sur. Co.,* 256 F.Supp. 266, 272 (D.Mass.1966). It is, therefore, essentially impossible to conceive of a set of circumstances that would constitute "actual fraud" under the Black's Law Dictionary definition, but which would not also constitute "false pretenses," as that term has historically been defined.

### 2. Application of *Roddenberry*

Even if there were some recognizable difference in section 523(a)(2) and section 17(a)(2), what impact would that difference have on *Roddenberry?* The decision is not based on the conclusion that credit card promissory fraud does not constitute either a false representation or false pretenses. If that had been the basis of the court's conclusion, the court's opinion would have been much shorter, since any discussion of "credit card economy" and "assumption of the risk" and "improvident creditors" would have been completely unnecessary. The court's decision was based on the assumption that credit card promissory fraud fell within the definition of the terms that then appeared in the non-dischargeability statute, and on the court's conclusion that *to refuse to discharge a credit card debt resulting from promissory fraud, when the credit card issuer had specifically assumed the risk of non-payment despite a debtor's apparent inability to repay,* would be unfair and inequitable to both the debtor and the creditor.

These assumptions and conclusions have a firm basis in the common law precepts of consent; acquiescence and estoppel; and rudimentary principals of justice and equity applicable to all forms of frauds and other tortuous activities. The principles of *Roddenberry* are inherently relevant to all cases

involving credit card promissory fraud, regardless of which section 523(a)(2)(A) pigeonhole that activity may, or should be slotted in. Whether those principles should apply to a particular transaction is governed by the resemblance of that transaction to the transaction involved in that case, that is, using a charge card without the intent to repay the money borrowed by the use of the card, and not on what the transaction is called. Merely labeling the activity by a different name, "actual fraud" rather than "false pretenses," makes those principles no less relevant or salient. This is particularly true here.

*Roddenberry*, unlike other credit card debt dischargeability cases, recognizes the unique relationship between credit card issuers and credit card users and the policy considerations unique to credit card transactions.[10]

10. Credit card transactions make application of traditional standards of review problematic, particularly the "reliance" element of 523(a)(2)(A). Of course, a creditor must have actually relied on the debtor's representations for non-dischargeability to be mandated. It would be illogical to suggest in this case that when the plaintiff issued the card to the debtor, it did not expect the debtor to pay back any amounts she borrowed from the plaintiff through the use of the card, or that the plaintiff did not "actually" rely on the debtor's representations that she would repay those amounts. No consumer lender would lend money unless it expected some money to be paid back. Nor would any commercial lender lend money on the expectation that some money would not be paid back. But how much does a credit card company really expect to be paid back on any given account? Is there some point at which a credit card lender, after receiving months of interest payments, profits on an account even though the principal debt owed has not been fully paid? Beyond that point, can that creditor be properly said to have relied on the debtor's implied promise to pay?

Was it reasonable for the plaintiff to anticipate that Ms. Gilmore would be able to repay the sums that she charged to the plaintiff's card? Section 523(a)(2)(A) does not require for non-dischargeability that a creditor have "reasonably" relied on the debtor's representations. *Only justifiable reliance is required, which* means that a creditor is justified in relying on a debtor's representations unless those representations were patently false. *Field v. Mans,* 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277, 281 (11th Cir.1995). Objective proof of the unreasonableness of a creditor's reliance on representations made by a debtor, however, is relevant to the issue of whether or not the creditor in fact relied upon those representations. "As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Field v. Mans,* 516 U.S. at 76, 116 S.Ct. 437. "Reasonableness of the reliance may be used as proof that the creditor did rely." *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d at 281.

On the issue of justifiable reliance, no facts were adduced which suggest that the plaintiff's reliance on the debtor's implied representations that she would repay the amounts borrowed on her credit card was unjustified. There is no proof that the plaintiff knew that the debtor was already over $20,000 in debt, from the use of other credit cards, when she began borrowing money from the plaintiff by using the plaintiff's card. Would proof of the plaintiff's knowledge of that fact have made the plaintiff's reliance unjustified or unreasonable? And how would the plaintiff had obtained that knowledge absent investigation? The concept of justifiable reliance permits a plaintiff to rely unequivocally on a representation or promise made by a debtor, without investigating or acting reasonably to determine the truth of the representation or promise, unless the statement is patently false, i.e., the falsity of the statement is apparent either from the statement itself, or should be apparent to the plaintiff by the use of one of five senses, or should be apparent to the plaintiff from actual knowledge of facts that the plaintiff has when the statement was made. *Field v. Mans,* 516 U.S. at 71, 116 S.Ct. 437; *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d at 283. Is it the debtor's responsibility at trial to negate the "justifiable" nature of a creditor's reliance? Apparently so, absent patent falseness, since it appears that the "justifiable" nature of a creditor's reliance must be presumed from a representation that is not patently, on its face, false (i.e., representing that a black horse is in reality a white bull), unless the debtor negates that presumption by proving the creditor's knowledge of facts that would lead the creditor to know that a statement not apparently false, was indeed probably false. Certainly it would be difficult for a creditor to negate by positive proof any knowledge of facts that might have made its reliance unjustified, i.e, facts that, if known to the creditor, should have led the creditor to see that the debtor's promise to repay was patently false when made.

Thankfully, the Court in *Roddenberry*, virtually eliminated, for practical reasons, the necessity of resolving very complex issues of reliance in most cases involving the use of credit cards.

But does *Roddenberry* run afoul of the decision of the Supreme Court of the United States in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) or conflict with the decision of the Court of Appeals for the Eleventh Circuit in *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277 (11th Cir.1995), both of which require only justifiable reliance, rather than reasonable

In so doing, *Roddenberry* adds an "assumption of the risk" element into the 523(a)(2)(A) equation to insure "that improvident creditors are not to be afforded special protections in bankruptcy for the assumption of [those] common business risks." *Roddenberry*, 701 F.2d at 932 (parenthetical added). But at the same time, *Roddenberry* recognizes the comfort the credit card issuer enjoys because the issuer can, with a wholly voluntary business decision to issue a credit card, factor the risk of non-payment into finance charges and has at all times during the credit relationship, the power to revoke a debtor's charging privileges thereby precluding further loss because of non-payment or anticipated non-payment.

In his opinion for the court in *Roddenberry*, Circuit Judge James C. Hill explained the balance in this equation. He wrote:

> The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot,* 16 B.R. 50, 52 (Bkrtcy.M.D.La.1981). Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

> Bearing in mind these considerations, we hold that the voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further possession and use of the card, and until the cardholder is aware of this revocation. A card issuer, acting upon its own judgment, may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17a(2)'s exemption from discharge. Purchases made with knowledge that one is not entitled to either use or possession constitute the type of deception intended to be exempted from discharge. It is more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the card.

The Roddenberrys, however, maintain that the application of Davison–Paxon is irrelevant because the bank did not rely upon any fraudulent misrepresentations implied or otherwise. Because the Roddenberrys' account was constantly above

reliance, for a determination of non-dischargeability under section 523(a)(2)(A)? Does *Roddenberry's* "assumption of the risk" philosophy, in effect, require credit card issuers to act reasonably to protect themselves from loss by extending credit only to persons whose creditworthiness has been verified and spreading the risk of loss to all credit card users, rather than permitting credit card issuers to rely on a debtor's bare promise to repay, without investigating the debtor's creditworthiness? Or is the basis of *Roddenberry* the conclusion that the exact nature and extent of a credit card issuer's reliance on a credit card user's promise to repay cannot be determined or proved, or the conclusion that, as a matter of law, a credit card company's reliance on the assurances of a complete stranger, of unknown creditworthiness, without taking precautions to protect itself, while at the same time, passing losses on to other customers, is so reckless as to be unjustified? *More than likely, Roddenberry is simply a variation of the common law principles of consent and estoppel, which may preclude a recovery for fraud whether the plaintiff justifiably relied on a debtor's misrepresentation or not.* Those principles are discussed below.

its established credit limit, the bankruptcy court agreed that the bank did not rely upon any implied misrepresentation not to pay. Although not incorrect, this finding is relevant only as it pertains to the time prior to the bank's unconditional revocation of the Roddenberrys' possession and use of the card. Debts arising prior to the communication of revocation are part of the risk assumed by the bank. During this period, the bank risked non-payment by authorizing conditional possession of the cards. This risk was assumed despite the Roddenberrys' apparent inability to pay, and the credit they obtained during this period was implicitly authorized by the bank. However, once the unequivocal revocation of credit privileges was communicated, the bank no longer agreed to assume this risk. Beyond the point of revocation, Mrs. Roddenberry was not merely concealing an inability to pay, but rather was affirmatively defrauding the bank with whom she no longer had any type of relationship. Unfortunately, the bankruptcy court's findings of fact were developed from a Davison–Paxon perspective, and as a result crucial findings inadvertently were omitted. It therefore is necessary to remand this case for a determination of whether the bank unconditionally revoked the Roddenberrys' right to all use and possession of the cards and if so when that revocation was communicated to Mrs. Roddenberry.

701 F.2d at 932–933.

■ Under *Roddenberry*, a credit card company that assumes the risk of non-payment, by providing unsolicited credit, by exhorting and encouraging its customers to make maximum use of that credit, and does not properly monitor or accurately assess the abilities to pay of those to whom such credit is extended, should not be allowed unlimited recourse to correct the self-inflicted damage caused by such irresponsibility. A creditor who recklessly bestows credit, should not benefit from such a lack of caution, especially when the exercise of rudimentary precautions could have prevented its losses.

This Court must conclude that, based on *First National Bank of Mobile v. Roddenberry (In re Roddenberry)*, 701 F.2d 927 (11th Cir.1983), resolution of the question of whether or not Ms. Gilmore intended to honor her implied promise is irrelevant and unnecessary to the determination of dischargeability in this case, since all of the charges were made by her prior to the revocation of her charge privileges.

## B. Consent

■ Because the terms in § 523(a)(2)(A) incorporate the general common law of torts, if the specific holding in *Roddenberry* does not control the resolution of the issues before the Court, dischargeability of the debtor's debt is, nonetheless, mandated by the related common law doctrine of consent.[11] That doctrine explains that, "no one can enforce a right arising out of a transaction which he has voluntarily assented to. This rule applies to intentional acts which would otherwise be tortious." *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 317 S.E.2d 748, 754 (1984).[12] The evidence before the Court in this regard is uncontested.

Ms. Gilmore did not ask the plaintiff to send her a credit card or to offer her a line of credit. In contrast, the plaintiff actively and

11. "We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field v. Mans*, 516 U.S. 59, 71 n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

12. "One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it." Restatement (Second) of Torts § 892A (1977). "[N]o one suffers a legal wrong as the result of an act to which, unaffected by fraud, mistake or duress, he freely consents or to which he manifests apparent consent. This

principle is expressed in the ancient legal maxim, *volenti non fit injuria*, meaning that no wrong is done to one who consents." Restatement (Second) of Torts § 892A cmt. a (1977). "Plaintiff cannot complain if defendant merely followed his instructions." *Flanzbaum v. Gordon*, 194 A.2d 125, 126 (D.C.Ct.App.1963).

"[C]onsent to a tort can arise even without absolute certainty as to the occurrence of the tort." *Pan Eastern Exploration Co. v. Hufo, Oils*, 855 F.2d 1106, 1129 (5th Cir.1988). Acquiescence coupled with suspicion strong enough to make a risk "known and appreciated" will suffice. *Id.*

aggressively solicited Ms. Gilmore's participation in its credit card business which participation the plaintiff now contends should result in the non-dischargeability of the debt that resulted from that participation. Excerpts from the initial letter sent to Ms. Gilmore offering her a "pre-approved" credit card and $5,000 line of credit explain. Those portions read:

**Just return the form above for a Gold MasterCard with no annual fee and a fixed APR on purchases of only 6.9% until January 1, 1997!**

> \* No Annual Fee
>
> \* 6.9% fixed APR on purchases until January 1, 1997.
>
> \* Pre–Approved $5,000 Line of Credit
>
> Dear Honey Gilmore:
>
> Congratulations! Your excellent credit history has earned you the right to carry a Gold MasterCard that will save you money two ways:
>
> 1. You pay *no annual fee* ...
>
> 2. You have a *low 6.9% fixed APR on purchases until January 1, 1997.*
>
> Plus, you will also command fantastic buying power with your new Gold Master-Card.
>
> **You are pre-approved for a $5,000 credit line**
>
> That's enough money to cover almost any imaginable charge, from your weekly fill-up at the gas station to airline tickets for the whole family. It's enough to make the Gold MasterCard the *only* card you need to carry. And its waiting for you now.
>
> Simply fill out and return the Invitation above. When your new card arrives, you can put your new credit line to work in a variety of ways ...
>
> \* *Charge purchases at over 10 million locations*—that's 3 time more than the American Express Gold card, and 5 times more than the Discover Card.

Plaintiff's Exhibit 1(1).

After inducing Ms. Gilmore to receive the card, by praising her for her "excellent credit

history" and promising no annual fee, a low introductory annual percentage rate, and "enough money to cover almost any imaginable charge," *including "airline tickets for the whole family,"* (although presumably not including a family's pets), the plaintiff actively and aggressively encouraged Ms. Gilmore to use the card freely. When the plaintiff discovered that *Ms. Gilmore did not use her card during the year she received it,* that encouragement accelerated.

In March of 1996, sometime after Ms. Gilmore received her card, but before she used it, Mr. Bruce Gordon, "Senior Vice President" of the plaintiff, sent the debtor a letter which, in effect, begged Ms. Gilmore to use the card, to take advantage of her "generous" credit line, and to experience the incredible "buying power" of the card. Apparently ignoring that *Ms. Gilmore was at the time in debt for over $15,000.00 on three other credit cards,* Mr. Gordon explained to Ms. Gilmore:

> As a First Card Card member, you know the importance we place on giving you the finest personal service. In fact, that's why I'm writing you today.
>
> *I noticed that you haven't had the chance to use your card lately. And I'm a little concerned. If there's a problem, I want to take care of it right away. Because your satisfaction is really important to me.*
>
> ...
>
> *If your card is in your wallet, but you just haven't used it, please give us a chance to prove that we really do give more. Use your First Card credit card the next time you're out.*
>
> See for yourself how our lower minimum monthly payments can help you manage extended payments much more easily. Also, our credit lines are often more generous than the competition's, so you can have more buying power.
>
> (That can be important when you have the need to spend a lot more on travel, entertainment, and shopping.)

Plaintiff's Exhibit 1(5) (March 1996) (emphasis added).[13]

---

**13.** In March 1996 the balances on the cards being used by Ms. Gilmore were: $6,692.74

(First Union); $4,320.17 (People's Bank); and $6,776.88 (CitiBank).

And if this were not enough, after that letter the plaintiff continued to encourage Ms. Gilmore to make charges on the card, through messages printed on the debtor's November 1996, December 1996 and January 1997 monthly account statements, statements which track the debtor's card balance from zero to over $2,500 in only three months. Those messages read:

> Get instant cash for the holidays without touching your checking account. Simply get a cash advance with your first card at Cirrus ATM's, banks, or financial institutions. It's the *easy way to get extra spending money.*

> See the enclosed insert for great getaway savings ... brought to you by First Card and Mastervalues.

> First Card—what you need, when you need it.

> You don't have to pay for the holidays all at once. Take advantage of our low repayment rate if you like. Your minimum payment due this month is only $52.00.

> First Card presents "Flowers First" for all your floral needs. Just call 1–800–270–1788 24 hours a day—7 days a week. Same day or next day delivery. Great gift ideas! Ask for suggestions. Guaranteed fresh. Brighten a day!

Plaintiff's Exhibit 1(8, 9, 11) (emphasis added).

The conclusions are inescapable that the plaintiff induced Ms. Gilmore to receive the credit card, persuaded Ms. Gilmore to use the credit card, and encouraged her to borrow the full amount of her credit line, and it did so, according to the letter of solicitation first sent by the plaintiff to Ms. Gilmore, with full knowledge of her "*excellent credit history.*" How should this Court now perceive the plaintiff's complaint that the same funds that it begged and encouraged the debtor to borrow were **fraudulently obtained**, where the plaintiff voluntarily initiated the credit relationship with supposedly full knowledge of the risks involved and where the plaintiff fostered the debtor's participation in that relationship?[14] This Court is more inclined to accept that, "[o]ne cannot complain of the proximate consequences of an act done at his request," *Law v. Gulf States Steel Co.,* 229 Ala. 305, 156 So. 835, 839 (Ala.1934) than it is to accept the plaintiff's present argument. The issue here is not whether Ms. Gilmore improperly used, or even abused, her charging privileges. The issue is whether she committed **fraud**.

---

**14.** See *Ragnar Benson, Inc. v. Kassab,* 325 F.2d 591 (3rd Cir.1963)(an owner could not be held liable to a construction company for participating in a breach of trust by a former officer of the construction company in diverting a contract from the construction company where construction company, upon learning of the diversion of the contract failed to avail itself of an opportunity to warn owner of its opposition to the diversion of the contract and thereby failed to give owner an opportunity to save itself from liability, and instead permitted owner to carry out its contract with other company); *Pinney & Topliff v. Chrysler Corp.,* 176 F.Supp. 801 (S.D.Cal. 1959)(where former automobile dealer voluntarily terminated dealership, he could not recover damages for alleged fraud against manufacturer, on ground that manufacturer represented to former dealer that if former dealer, instead of terminating dealership, would continue operations, manufacturer would produce a satisfactory buyer of dealership within reasonable time, but did not do so); *Flanzbaum v. Gordon,* 194 A.2d 125, 126 (D.C.Ct.App.1963)(automobile transmission repairer who refused to pay electrician's charges for repairs on automobile, which transmission repairer had delivered to electrician, and who said that owner would have to pay them and that owner could take automobile if he wanted it could not recover from electrician for amount of charges when electrician pursuant to his instructions delivered automobile to owner who left district without paying transmission repairer); *Law v. Gulf States Steel Co.,* 27 Ala.App. 484, 175 So. 322 (1937), cert. denied, 234 Ala. 352, 175 So. 326 (1937)(in action for damages resulting from overflow allegedly caused by defendant's dam and raising of road, defendant could show, as matter of consent, that road was raised at plaintiff's request); *Shahan v. Alabama Great Southern R. Co.,* 115 Ala. 181, 22 So. 449 (1897)(in action against railroad company to recover damages sustained by reason of an overflow of water in a store house where the plaintiff, a merchant, was doing business, the merchant cannot complain of a spur track which obstructs the natural flow of surface waters, and floods his premises, where the railroad company built the spur track to the merchant's warehouse at his request, and for his convenience).

## C. Estoppel

 Similarly, if the specific holding in *Roddenberry* does not control the resolution of the issues before the Court, again because the terms in § 523(a)(2)(A) incorporate the general common law of torts, dischargeability of the debtor's debt is equally mandated by the related common law doctrine of estoppel.[15]

The plaintiff did not offer any evidence in support of its complaint other than evidence of the debtor's purported inability to repay. For the reasons expressed below, the Court finds that the plaintiff is estopped from asserting that evidence here. Thus as applied to the present case, the doctrine of estoppel negates any proof the plaintiff has offered. Consequently, the debt owed by Ms. Gilmore to the plaintiff is dischargeable, if for no other reason, because the plaintiff did not meet its burden of proving that the debt should be nondischargeable.[16] Again, the evidence before the Court is uncontested.

In this matter, the plaintiff relied almost exclusively on evidence of the debtor's bleak personal financial condition. That evidence was introduced to show that the debtor lacked the ability to pay charges made on the credit card at the time those charges were made. But, as indicated in the preceding section, the plaintiff "pre-approved" the card based on information known only to the plaintiff, who neither required nor obtained any credit information from Ms. Gilmore for the purpose of approving her receipt of or use of the card. And when the plaintiff solicited Ms. Gilmore to receive her "pre-approved" card, it informed Ms. Gilmore that the reason she was given the opportunity to receive the card was because of her "excellent credit history." In other words, when the plaintiff stood to benefit from Ms. Gilmore's use of the card, it expressed confidence in Ms. Gilmore's ability to repay the amounts that might subsequently be borrowed by her on the card, ostensibly because it had satisfied itself, through its own investigation, that Ms. Gilmore had the wherewithal to repay.

Now that the tables have turned, and Ms. Gilmore wishes to be relieved of her obligation to repay, the plaintiff takes the contrary position that Ms. Gilmore lacked the ability to repay the amounts charged on the card, an inability that the plaintiff appears to contend existed *at the same time the plaintiff extended the card to the debtor based on the debtor's excellent credit history.* That

---

**15.** See notes 11 and 12. Estoppel and consent are related concepts. See *Rawls v. Conde Nast Publications, Inc.*, 446 F.2d 313 (5th Cir.1971), *cert. denied*, 404 U.S. 1038, 92 S.Ct. 712, 30 L.Ed.2d 730 (1972)(error, if any, in instruction that plaintiff was not entitled to recover if she gave her actual or implied consent for defendant's employee to remain in her home and continue to take photographs after she discovered him there, was harmless where plaintiff was estopped from recovering from defendant because, at time of alleged intrusion, plaintiff made no meaningful attempt to protect her property and demonstrated no visible emotional distress, but rather acquiesced in continued presence of the employee).

**16.** The burden of proving nondischargeability lies with the creditor-plaintiff, as the following demonstrate:

Under 11 U.S.C. § 523(a)(2)(B), a debt is nondischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive. The objecting creditor has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994)

"Because of the very nature and philosophy of the Bankruptcy law the exceptions to dischargeability are to be construed strictly, *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915), and the burden is on the creditor to prove the exception. *Household Finance Corp. v. Danns*, 558 F.2d 114 (2d Cir.1977)." *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986).

"Second, a creditor seeking an exception to discharge carries a substantial burden, having to prove that the debtor's conduct meets all of the requirements of a Section 523 discharge. *In re Crosslin*, 14 B.R. 656, 658 (Bankr.M.D.Tenn. 1981)." *TranSouth Fin. Corp. of Florida v. Johnson*, 931 F.2d 1505, 1509 (11th Cir.1991)

"It is true that the creditor normally carries the burden of showing such an exception. *In re Cross*, 666 F.2d 873, 880 (5th Cir. Unit B 1982)." *Federal Deposit Ins. Corp. v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1519 (11th Cir.1984).

change in position is contrary to the principals of equity and fair play. Having taken the position that Ms. Gilmore had the ability to repay and having encouraged her to use the card, the plaintiff is now estopped from taking the position that Ms. Gilmore lacked the ability to repay when she used the card, and the plaintiff is estopped from relying on evidence of the debtor's inability to repay in order to prove fraudulent intent.[17] See, e.g., *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52 (11th Cir.1995) (secured creditor waived right to object to non-dischargeability of debt resulting from debtor's sale of collateral out of trust, where creditor knew that debtor was selling collateral and using proceeds to pay general operating expenses but creditor did not object or otherwise do anything to protect its interests in the collateral).[18]

As explained by Circuit Judge Joseph C. Hutcheson in *Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products*, 75 F.2d 13, 17 (5th Cir.1935):

> There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give a different color to what they formerly said and did.

---

17. Certainly, the actions of the plaintiff are contradictory. The implication of the initial letter of solicitation mailed to the debtor by the plaintiff is that the plaintiff then believed, based on its on independent credit evaluation, that the debtor had excellent credit. Now the plaintiff contends that the debtor lacked the ability to repay when she obtained the card. A similar incongruity exists in almost every credit card case under 523(a)(2)(A), especially cases involving "pre-approved" credit cards, where proof of the debtor's fraudulent intent consists of circumstantial evidence that the debtor lacked the ability to repay. Did the plaintiff actually believe that the debtor had the ability to repay when it issued the card to her, but was mistaken in that belief? If the plaintiff had reason to believe that the debtor had the ability to repay the debts which she subsequently incurred on the card, was it also reasonable for the debtor to believe that she had the ability to repay that debt? Should the plaintiff be able to both seek to profit from encouraging the debtor to extend her charges to the limit, *and* contend that the debtor had the inability to repay the debt that the plaintiff encouraged her to incur? The answer to these riddles is found in the common law concepts of consent and estoppel, which preclude the chameleon type result the plaintiff urges here. And consideration of *Roddenberry* in that light leads to the conclusion that *Roddenberry* is not only correct in a fair, moral and public policy sense, but is also indubitably correct in the legal sense.

18. In *Wolfson*, the secured creditor objected to the dischargeability of the debt owed by a Chapter 7 debtor, on the grounds that the debtor's sale of collateral securing the debt owed to the creditor constituted a willful and malicious injury to the creditor's interest in the collateral. The circuit court reversed the lower court's determination that the debt was non-dischargeable, based on the fact that the creditor knew that the debtor was selling its collateral and placing the proceeds into a general account out of which the debtor was paying ordinary business expenses, but did not object or take steps to protect its collateral. The court held that the creditor, by virtue of its knowing acquiescence in the debtor's activities, waived its right to complain of any damage caused by that activity. Circuit Judge Rosemary Barkett wrote for the Court:

> However, it is not necessary to reach the question of whether Wolfson's actions were willful and malicious, nor the question of whether Wolfson's sale of collateral and failure to remit the proceeds amounted to conversion. As the bankruptcy court recognized, ECC not only knew of and failed to object to the Farm's sales of collateral and its business practice of depositing all proceeds into a general business account, but ECC also continued to renew and extend additional credit to the Farm. For example, ECC loaned the Farm $600,000 on June 29, 1988; $2,400,000 on February 21, 1989; $1,800,000 on February 21, 1989; $900,000 on February 21, 1989; $500,000 on February 21, 1989; and $150,000 on October 6, 1989. We find that since ECC failed to enforce whatever rights it may have had regarding the disposition of its collateral, it waived its right to assert under 11 U.S.C. § 523(a)(6) that its claim is non-dischargeable and that it suffered "willful and malicious" injury by Wolfson. If ECC "acquired knowledge" of Wolfson's alleged conversion and did so when "it could have asserted its security interest in the property and failed to take reasonable steps to protect its security, the indebtedness should be discharged." *Bennett v. W.T. Grant, Co.*, 481 F.2d 664, 666 (4th Cir.1973). Put another way, ECC's "failure to take reasonable steps to protect its collateral … prevented application of the exception." *[In re Billy F.] McGinnis*, 586 F.2d [162] 163 (10th Cir.1978).

56 F.3d at 54–55.

*Id.* at 17.[19] That estoppel operates here. The plaintiff should not be allowed to change its position simply because its objective has changed.

Based on the above, the Court finds that because the plaintiff is estopped from asserting facts in support of a position different than its pre-bankruptcy position, that there is no evidence for this Court to find that the debt owed by the debtor to the plaintiff is non-dischargeable pursuant to 523(a)(2)(A). Thus, the plaintiff has failed to meet its burden in this regard.[20]

19. The concept is often referred to as "quasi-estoppel." "Quasi estoppels are sometimes said to include such matters as the doctrine of 'election,' the principle which precludes a party from asserting to another's disadvantage a right inconsistent with a position previously taken by him, waiver, ratification, and laches. Indeed, the doctrines of estoppel, waiver, and acquiescence are considered, by some courts at least, as of one family in the law, and the doctrine of laches is closely akin to these." 28 Am.Jur.2d *Estoppel and Waiver* § 29 (1966)(footnotes omitted).

Estoppel may result from acquiescence:

The doctrine of equitable estoppel or estoppel in pais is frequently applied to transactions in which it would be unconscionable to permit a person to maintain a position inconsistent with one in which he, or those by whose acts he is bound, has acquiesced. Declarations or conduct which might not of themselves amount to an estoppel may become such by acquiescence. Estoppel by acquiescence is, obviously, closely related on the one hand to estoppel by consent and, on the other hand, to estoppel by silence or inaction, or by delay. In fact it is often impossible to distinguish clearly between such estoppels, and the courts in many instances use the term "acquiescence" as covering or including all the others. "Acquiescence," as the term is here used, however, refers to an implied consent and need not involve anything in the nature of a positive affirmation; and while, as has already been pointed out, silence or inaction may, under some circumstances, amount to acquiescence, it does so only where the circumstances are such as to afford some ground for believing that acquiescence was intended.

The rule is that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts, remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

28 Am.Jur.2d *Estoppel and Waiver* § 57 (1966).

Estoppel may result from one's acceptance of the benefits of a transaction:

Estoppel is frequently based upon the acceptance and retention, by one having knowledge or notice of the facts, of benefits from a transaction, contract, instrument, regulation, or statute which he might have rejected or contested. This doctrine is obviously a branch of the rule against assuming inconsistent positions, and it has been said that such cases are referable, when no fraud either actual or constructive is involved, to the principles of election or ratification, rather than to those of equitable estoppel. The result produced, however, is clearly the same, and the distinction is not usually made. Such estoppel operates to prevent the party thus benefitted from questioning the validity and effectiveness of the matter or transaction insofar as it imposes a liability or restriction upon him, or, in other words, it precludes one who accepts the benefits from repudiating the accompanying or resulting obligation. And the principle of estoppel by the acceptance of benefits may operate to prevent a party from profiting by his own wrong.

28 Am.Jur.2d *Estoppel and Waiver* § 59 (1966).

And, estoppel may also result when a party attempts to take inconsistent position regarding a matter or transaction:

Generally speaking, a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action. This principle operates to preclude one who prevents a thing from being done from availing himself of the nonperformance which he has himself occasioned. Similarly, it operates to prevent a person from taking advantage of his own wrong. It has also been held to prevent one who has been wronged in a transaction from subsequently impeaching it after having recognized it as valid.

28 Am.Jur.2d *Estoppel and Waiver* § 68 (1966).

20. The plaintiff contends that, in the very least, the charges made by Ms. Gilmore on her credit card on or within 60 days of bankruptcy are non-dischargeable by virtue of subsection (C) of section 523(a)(2). That subsection creates a presumption that "consumer debts owed to a single creditor and aggregating more than $1,000 for 'luxury goods or services' incurred by an individual debtor on or within 60 days before" the bankruptcy order for relief are non-dischargeable. 11 U.S.C. § 523(a)(2)(C). The term "luxury goods or services" is defined to not include "goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." *Id.*

## IV. CONCLUSION

Based on the above findings of fact and conclusions of law, the relief requested in the *Complaint for Nondischargeability* filed by the plaintiff, F.C.C. National Bank dba First Card, is due to be denied and judgment rendered in favor of the debtor.

A separate order will be entered in accordance with this memorandum opinion.

### ORDER

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED, ADJUDGED AND DECREED** that:

1. The relief requested in the *Complaint for Nondischargeability* filed by the plaintiff is **DENIED**;
2. Judgment is entered in favor of the Defendant and against the Plaintiff; and
3. The debtor's debt to the plaintiff is **DISCHARGEABLE**.

A review of the debtor's monthly account statements reveals that the debtor indeed made $1,107.98 in charges on the plaintiff's card on or within 60 days before May 16, 1997, the date she filed bankruptcy. According to the debtor's testimony, however, several of those charges were not made to purchase luxury goods or services. For example, on March 22, 1997, the debtor made a $81.26 charge to purchase routine maintenance for her automobile at Express Oil Change. The debtor made a $81.45 charge on April 13, 1997 to purchase groceries from Bruno's Supermarket. On May 3, 1997, the debtor made two charges, one for $18.17 and the other for $67.46, for the purchase of a couple of shirts and several pair of panty hose from clothing outlets in Boaz, Alabama. Subtracting the charges made by the debtor during the 60 day period prior to bankruptcy for non-luxury items obviously leaves the plaintiff short of the requisite $1,000 threshold for application of section 523(a)(2)(C). Therefore, the contention that any part of the debt owed by Ms. Gilmore to the plaintiff is non-dischargeable by virtue of that code section is without merit.